# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

One Cellular Telephone Described in Attachment A

Case No. **18-1797·M**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A

located in the _____ Eastern _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC Section 841 | Possession with intent to distribute a controlled substance |

The application is based on these facts:
See Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeremy Beh, SA FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: **11·6·18**

*Judge's signature*

City and state: _____

Timothy R. Rice, US Magistrate Judge

*Printed name and title*

## AFFIDAVIT

$18 - 1797 - m$

I, Jeremy Beh, being duly sworn and according to law, depose and state the following:

## GENERAL BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since June 2014. I am currently assigned to a Violent Gang Task Force in the Philadelphia Field Office. While acting in my capacity as an FBI agent, I have investigated violations of federal criminal law over which the FBI has jurisdiction, including violent crimes, gangs, drug trafficking organizations, and other violent criminal elements. Over the course of these investigations, I have interviewed witnesses, conducted physical surveillance, monitored the use of human sources, made consensually monitored recordings, and utilized other investigative techniques. I have participated in searches authorized by consent, search warrants, and other legal grounds, for residences, businesses, cellular phones, and vehicles for the purpose of obtaining evidence. I have applied for and received search and seizure warrants.

2. As part of my duties as an FBI Special Agent, I investigate how Drug Trafficking Organizations ("DTO") transport controlled substances and drug trafficking instrumentalities, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846. I have been trained in various aspects of law enforcement, including the investigation of narcotics offenses.

3. The information contained in this affidavit is based upon my personal observations and investigation, information relayed to me by other special agents and/or other law enforcement agents, as well as official reports of law enforcement. Because this affidavit is being submitted for the limited purpose of securing authorization to search a cellular telephone ("SUBJECT CELLULAR TELEPHONE"), I have not included every fact to me concerned this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to seize and

1

search the SUBJECT CELLULAR TELEPHONE that was seized during the lawful search of 639 East Raymond Street by the Philadelphia Police Department on August 29, 2018, and is identified in Attachment A as follows:

Black LG cellular phone
Model: LGMP260
Serial Number: 805CYEA707076
IMEI: 354446-09-707076-4

4. As set forth below, there is probable cause to believe that the above-mentioned SUBJECT CELLULAR TELEPHONE contains evidence, fruits, and instrumentalities of crimes against the United States occurring in this judicial district, specifically, violation of Title 21, United States Code, Section 841(a)(1), (distribution and possession with the intent to distribute controlled substances). I believe that the SUBJECT CELLULAR TELEPHONE will still contain evidence, fruits, and instrumentalities of crimes against the United States, as the SUBJECT CELLULAR TELEPHONE has been in the custody of law enforcement officials since it was seized.

5. Based on my training, knowledge and experience, as well as the training, experience and knowledge of other officers and agents, I have learned the following in connection with investigating those involved in illegal trafficking of controlled substances and detection of dealing in proceeds of unlawful activity: Individuals involved in illegal activity and drug dealing commonly maintain addresses or telephone numbers in books or papers or in cellular telephones which reflect names, addresses and/or telephone numbers of their associates in the illegal organization and/or individuals involved in their narcotics and money laundering activities; individuals involved in narcotics trafficking frequently list drug associates on cellular phone directories, often by nickname or code, to avoid detection by law enforcement and other individuals who would able to identify them; and a review of a telephone's directory is one of

2

the few ways to verify the numbers (that is, the cellular phones, pagers, etc.) being used by specific targets, conspirators, and associates; individuals involved in narcotics trafficking often utilize multiple cellular phones to attempt to conceal their identity, avoid detection by law enforcement and to facilitate their drug trafficking activities. I also know that drug traffickers frequently use cellular telephone functions, such as text-messaging, email and voice communications, to communicate with other co-conspirators, buyers and suppliers in furtherance of their drug trafficking activities. Often, drug traffickers use multiple cellphones for their drug trafficking, in an effort to conceal their phone contact numbers and illegal activities from law enforcement and other individuals.

6. This affidavit requests the search of the property listed in Attachment A and the extraction from that property of electronically stored information as described in Attachment B.

## SUMMARY OF PROBABLE CAUSE

7. In April 2018, a Confidential Source (CS) reported to the FBI that CS was in a position to buy heroin from Jose FUENTOS, who law enforcement believed was involved in the distribution of narcotics. CS has been a confidential source with the FBI since July 2015. CS is a paid informant. CS was arrested on August 22, 2013, for terroristic threats and intimidation of witnesses or victims, and the disposition of these charges is unreported. CS has a 2014 conviction for manufacture of controlled substance by a person not registered, for which he was sentenced to 10 months and 4 days to 1 year 11 months and 29 days' imprisonment and 8 years' probation. CS's information has routinely proven reliable throughout this investigation and other investigations.

8. On April 5, 2018, CS met with FUENTOS to obtain a sample of heroin. On that date, law enforcement agents met with CS at a predetermined location. Agents searched CS and CS's

3

vehicle for weapons, money, and contraband, and found negative results. Investigative agents observed a grey-colored Honda Pilot with license plate number KLA-3759, registered to Christina Mosqeua. FUENTOS exited the car and entered CS's vehicle for approximately five minutes. FUENTOS then exited CS's car and walked back toward the Honda Pilot to retrieve an object from the center console before walking back to CS's car. FUENTOS then exited CS's car, returned to the Honda Pilot, and left the area. CS turned over 15 blue glass packets of suspected heroin, all stamped "Ducati," to investigative agents. CS was again searched for weapons, money, and contraband, with negative results. The purported heroin field-tested positive for heroin.

9. On April 10, 2018, CS arranged a meeting with FUENTOS to obtain a sample of bulk heroin. Agents set up surveillance of 639 Raymond Street and observed the Honda Pilot parked around the corner. Agents observed FUENTOS exit this address, enter the Honda Pilot, and drive away. Other law enforcement agents met with CS at a predetermined location. Agents searched CS and CS's vehicle for weapons, money, and contraband, and found negative results. CS called FUENTOS and spoke to a male in Spanish. CS, in the presence of a Spanish speaking agent, dialed (215) 900-8904, the phone number associated with FUENTOS at the time, and spoke to a male in Spanish. CS set up a meeting with FUENTOS to obtain a sample of bulk heroin from FUENTOS. Agents then observed FUENTOS exit 639 E. Raymond Street, enter the Honda Pilot and drive to meet CS. Agents observed FUENTOS park the Honda Pilot, exit the car and enter CS's car for approximately 10 minutes. FUENTOS then exited CS's car and returned to the Honda Pilot before leaving the area. CS turned over to investigative agents one small piece of clear plastic that was knotted that contained approximately one gram of purported

4

bulk heroin. CS was again searched for weapons, money, and contraband, with negative results. The contraband field-tested positive for heroin.

10. On April 15, 2018, law enforcement obtained a search warrant to search FUENTOS's residence at 639 E. Raymond Street. That same day, other officers from Narcotics Strike Force stopped FUENTOS and Mabel Castillo, who were driving the Honda Pilot in the area of Front and Allegheny Avenue. They were both arrested after 25 grams of heroin was discovered in a hidden compartment within the car. When law enforcement executed the search warrant on the residence the next day, April 16, 2018, no contraband was recovered.

11. On May 29, 2018, FUENTOS was placed on house arrest relating to his April 15, 2018, narcotics arrest.

12. CS informed investigative agents that on August 27 and 28, 2018, FUENTOS, using SUBJECT CELLULAR TELEPHONE, called CS on CS's cellular telephone. Call detail records for CS's cellular telephone confirm that FUENTOS called CS on these dates using the SUBJECT CELLULAR TELEPHONE. During these conversations, which were not recorded, CS told agents that FUENTOS claimed he had a kilogram of heroin to sell and that CS told FUENTOS CS wanted a sample of this heroin prior to purchasing it.

13. On August 29, 2018, at approximately 10:24 a.m., FUENTOS, using SUBJECT CELLULAR TELEPHONE, sent CS a text message with the address "639 E. Raymond Street." At approximately 2:05 p.m., at the direction of investigative agents, CS called FUENTOS on SUBJECT CELLULAR TELEPHONE in the presence of law enforcement. CS spoke to a male believed to be FUENTOS in Spanish about obtaining the sample of heroin. This conversation was audio recorded and later translated. During the call, FUENTOS asked CS if CS was on the way to meet him and to call him when CS arrived. At approximately 2:26 p.m., an investigative

5

agent drove CS to the 600 block of Raymond Street to meet with FUENTOS. CS then exited the car and walked to 639 E. Raymond Street, where investigative agents had already established surveillance. At approximately 2:31 p.m., CS called FUENTOS, informing him that CS arrived to the address. Investigative agents observed CS approach the front door of 639 E. Raymond Street, an unidentified individual[1] opened the door, and CS entered the house. CS remained in the house for approximately 10 minutes before investigative agents observed CS exit that address.

14. The conversation between CS and FUENTOS inside 639 Raymond Street was conducted in Spanish and was audio recorded and later translated. During this meeting, FUENTOS stated that, "I live here, I live here alone" and that "even my woman left me." CS and FUENTOS also discussed FUENTOS's ankle bracelet that he was wearing because he was under house arrest. CS then asked FUENTOS if he had a scale to "check it," referring to the narcotics. CS then stated that the "color looks, it looks good, you hear? Take, take a little bit out for me." FUENTOS then asked CS whether CS wanted a knife to cut it. CS then stated that "it smells really strong" and FUENTOS replied, "It smells good." CS then asked FUENTOS whether this is "first-hand stuff" and FUENTOS replied, "No one has touched that. But, if you don't like that one, he told me that, you know, we can bring something different." CS and FUENTOS then discussed the cost of the heroin. FUENTOS stated, "he's asking fifty-eight" and CS asked for a discount of "fifty-seven." CS and FUENTOS continued to discuss the price. FUENTOS then stated, "I have court next month" and that for now "I'm offering it from here, because . . . I can't go out," meaning that he has to sell the drugs from his home because he is on house arrest and is

---

[1] Surveillance was unable to view the individual who opened the door.

not permitted to leave. CS concluded the meeting stating that CS will get the product checked in the next fifteen minutes and will return to finalize negotiations for the price.

15. After the meeting, law enforcement observed CS exit 639 E. Raymond Street and walk directly to the car driven by an investigative agent. The investigative agent then drove CS to the location where other investigative agents were parked and CS handed over a small piece of aluminum foil containing suspected heroin. CS was again searched and found to be free of money and other drugs. The suspected heroin was field-tested and tested positive. CS informed investigative agents that when he entered FUENTOS's house, FUENTOS had a package of suspected heroin wrapped in grey tape sitting on a chair in the living room. CS stated that FUENTOS took a knife and slit the package open to provide CS with a sample, which FUENTOS placed in foil. CS took photographs of the suspected heroin package on his cellular telephone during this meeting and a short video that shows the package of suspected narcotics, as well as a split-second image of a male that appears to be FUENTOS. CS stated that CS and FUENTOS agreed that CS would purchase the kilogram for $57,000.

16. Law enforcement then obtained a state search warrant on August 29, 2018, for 639 E. Raymond Street, which was executed that day. When law enforcement entered the home, FUENTOS was on the second floor of the residence. The purported heroin was not in the house; however, the rear second floor bedroom window was open. When agents surveyed the grounds surrounding FUENTOS's residence, they observed a package wrapped in gray duct tape lying in a neighboring yard. Law enforcement did not observe FUENTOS dispose of the purported heroin out of the window. The package of suspected heroin recovered by law enforcement had a slit in it as if cut by a knife and the packaging matched that pictured in the photographs and

7

video taken by CS when he was in the house with FUENTOS. There was no one else in the vicinity. Law enforcement field-tested the suspected heroin, which tested positive.

17. Law enforcement searched the remainder of the house. During this search, law enforcement seized the following from within the residence, among other items:

    a. A cellular telephone;

    b. A gray roll of duct tape;

    c. A piece of mail addressed to FUENTOS at 639 E. Raymond Street; and,

    d. A knife that appeared to be the same knife in the picture provided by CS.

18. Law enforcement observed, but did not seize, a chair in the residence that appeared to be the same chair holding the heroin pictured in the photograph CS provided law enforcement.

19. FUENTOS was inside 639 E. Raymond Street at the time of the search and was wearing an ankle device that is typically worn by defendants placed on house arrest. No one else was inside the residence at the time of the search, and there was no indicia that other individuals lived at the address. Law enforcement maintained constant surveillance of the residence from the time CS left FUENTOS's residence until the time law enforcement executed the warrant. No one entered or exited the residence during this time.

20. FUENTOS was placed under arrest on August 29, 2018 and charged locally for possession with intent to deliver a controlled substance.

21. The suspected heroin recovered was then submitted to the Philadelphia Police Department ("PPD") Chemistry Lab for qualitative and quantitative analysis. The analysis by the PPD laboratory revealed the substance to contain heroin, fentanyl, and tramadol, and had a net weight of 999 grams.

8

22. On October 19, 2018, a Federal Complaint and Warrant was filed under seal, charging
Jose FUENTOS with knowingly and intentionally possessed with intent to distribute 100 grams
or more, that is, approximately 999 grams, of a mixture and substance containing a detectible
amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code,
Section 841(a)(1), (b)(1)(B). FUENTOS was placed into federal custody on October 23, 2018.

## EVIDENCE TO BE SEIZED

23. In my experience and training, as well as the experience and training of other officers and
agents, I believe the seized SUBJECT CELLULAR TELEPHONE contains evidence, fruits, and
instrumentalities of crimes against the United States occurring in this judicial district,
specifically, a violation of Title 21, United States Code Section 841 (possession with intent to
distribute a controlled Substance).

24. In my experience and training, as well as the experience and training of other officers and
agents, I know narcotics traffickers often utilize electronic equipment, such as cellular
telephones, to generate, transfer, count, record, and/or store information related to criminal
activities. In my experience and training, as well as the experience and training of other officers
and agents, I further know narcotics traffickers commonly utilize their cellular telephones to
communicate with co-conspirators to facilitate their narcotics and money laundering operation.
Additionally, narcotics traffickers often use multiple cellular phones to minimize their chances of
being intercepted by law enforcement by communicating with conspirators and associates over
cellular phones.

25. In my experience and training, as well as the experience and training of other officers and
agents, I further know narcotics traffickers use cellular phones to store text messages and other
information relevant to narcotics transactions, including but not limited to methods of trafficking

9

narcotics, sources of supply, and prices, type and amount of narcotics. Cellular phones can also supply historical information about the dates, times, duration, number, destination, and location of telephone calls, messages, photographs, video, audio, and other information processed or stored by the cellular telephone which would be evidence of criminal activity.

26. In my experience and training, as well as the experience and training of other officers and agents, I know narcotics traffickers and money launderers often store contacts lists, address books, calendars, photographs (including photos of co-conspirators and associates in the drug trafficking activity), video and audio files, financial data (including but not limited to credit card bills, account information, accounts receivable, accounts payable, general ledgers, cash disbursement ledger, check register, employment records, and correspondence), banking data (including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, blank or endorsed money orders, check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit boxes, money wrappers and wire transfers), assets (including but not limited to the possession, sale, purchase, transfer, and/or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry, regardless of the identity of the person(s) involved), identification records (including but not limited to applications for birth certificates, state identification cards, social security cards, and driver's licenses text messages), international and domestic travel records, and voice mails in their cellular telephones or other electronic devices. Such data, as identified above, as well as the cellular telephone's number itself (also stored in the cellular telephone) is relevant to showing the identities of co-conspirators, particular conspirators' contact with other coconspirators, and their contacts.

10

27. In my experience and training, as well as the experience and training of other officers and agents, I also know narcotics traffickers and money launderers frequently list drug associates in directories, often by nickname, to avoid detection by others. Also, I know that the narcotics traffickers and money launderers rarely subscribe to telephones in their own names, making it difficult to link a particular telephone, pager, or residence line to a particular trafficker or launderer. Such directories as the ones likely contained in the seized cellular telephone are one of the few ways to verify the numbers (i.e., telephones, pagers, etc.) being used by specific traffickers and launderers.

28. In my experience and training, as well as the experience and training of other agents, I also know narcotics traffickers often utilize multiple cellular phones to attempt to conceal their identity, avoid detection by law enforcement and to facilitate their drug trafficking activities.

## ELECTRONIC DEVICES AND STORAGE

29. This application seeks permission to search and seize things that the cellular telephone identified above might contain, in whatever form they are stored. Based on my experience and training, as well as the experience and training of other officers and agents, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

## MOBILE PHONES

30. Based on Your Affiant's training and experience I know that most people, including criminals, carry and use mobile phones and that these phones contain call histories, call logs, contacts, emails, phone book information, pictures, images, and text message logs.

11

31. Based on Your Affiant's training and experience I know that most people, including Criminals, carry and use mobile phones and that these phones contain call histories, call logs, contacts, emails and phone book information, pictures and images and text message logs.

32. The SUBJECT CELLULAR TELEPHONE is currently in the lawful possession of the FBI, whose offices are located at 600 Arch Street, Philadelphia, PA. The SUBJECT CELLULAR TELEPHONE is in storage at that location.

## TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

12

b. Digital camera: A digital camera is a camer4 often as part of a cellular telephone, that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of

13

numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include global positioning system GPS technology for determining the location of the device.

34. Based on my training, experience, common knowledge and research, and/or from consulting the manufacturer's advertisements and product technical specifications available online. I know that cellular telephones often have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

14

## ELECTRONIC STORAGE AND FORSENSIC ANALYSIS

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiar with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

15

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e) (2) (B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

39. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the FBI

16

intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

40. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

JEREMY BEH
Special Agent, FBI

Subscribed and sworn to before me
on November 6, 2018

TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

17

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The property to be searched is as follows:

Black LG cellular phone
Model: LGMP260
Serial Number: 805CYEA707076
IMEI: 354446-09-707076-4

The above SUBJECT CELLULAR TELEPHONE was seized during the lawful search of

639 E. Raymond Street, Philadelphia, PA by the Philadelphia Police Department on August 29,

2018. The above phone is currently stored at FBI Philadelphia Field Office, 600 Arch Street,

Philadelphia, PA.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of Title 21 United States Code, Section 841(a)(1), and involve **JOSE FUENTOS** since August 1, 2018 – August 29, 2018, including:

a. lists of customers and related identifying information, including contact phone numbers and email addresses;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to sources of narcotic drugs, including names, addresses, phone numbers, or any other identifying information;

d. any information related to the methods of trafficking in narcotics;

e. photographs of associates, co-conspirators, and other evidence of drug trafficking;

f. any information recording domestic and international schedule or travel;

g. any and all information related to credit card bills, account information, and other financial records, including but not limited to, accounts receivable, accounts payable, general ledgers, cash disbursement ledger, check register, employment records, and correspondence;

h. any and all information related to identification records, including but not limited to applications for birth certificates, state identification cards, social security cards, and driver's licenses;

i. any and all banking information, including but not limited to monthly savings and checking statements, canceled checks and banking communications, deposit tickets, withdrawal receipts, certificates of deposits, pass-books, money drafts, money orders

19

(blank or endorsed), check cashing logs, wire transfer logs, cashier's checks, bank checks, money orders, safe deposit boxes, money wrappers and wire transfers;

j. any and all information relating in any way to the possession, sale, purchase, transfer, and./or storage of any and all tangible or intangible assets, including but not limited to vehicles, real estate, and jewelry, regardless of the identity of the person(s) involved; and k. stored electronic information and communications, including but not limited to, telephone or address directory entries consisting of names, addresses and telephone numbers, schedule entries, photographs, audio, and video. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms records and documents include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including, but not limited to any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

20